965 F.2d 1098
 296 U.S.App.D.C. 136
 ALTAMONT GAS TRANSMISSION COMPANY, Petitioner
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent
El Paso Natural Gas Company, Pacific Gas Transmission
Company, Kern River Gas Transmission Company,
Pacific Interstate Transmission Company,
Southern California Gas
Company, Intervenors
 No. 91-1084
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 18, 1992.
Decided June 9, 1992.
As Amended July 22, 1992.
 
 Frederic G. Berner, Jr., with whom James F. Bendernagel, Jr. and Joseph R. Guerra, Washington, D.C., were on the brief, for petitioner. Margaret L. Bollinger, Houston, Tex., also entered an appearance for petitioner.
 Randolph Lee Elliott, Atty., F.E.R.C., with whom William S. Scherman, General Counsel and Jerome M. Feit, Sol., Washington, D.C., were on the brief, for respondent.
 
 
 1
 Raymond N. Shibley, Washington, D.C., with whom Elias G. Farrah, Boston, Mass., [296 U.S.App.D.C. 137] Keith T. Sampson, Washington, D.C., Frank R. Lindh, and Jack F. Fallin, Jr., San Francisco, Cal., were on the brief, for intervenor Pacific Gas Transmission Co.
 
 
 2
 Britton White, Jr., Denver, Colo., Phillip D. Endom, El Paso, Tex., Rush Moody, Jr., and Mark F. Sundback, Washington, D.C., were on the brief, for intervenor El Paso Natural Gas Co.
 
 
 3
 Paul M. Flynn, Harold L. Talisman, Washington, D.C., Margaret L. Bollinger, Houston, Tex., and Mark C. Moench, Salt Lake City, Utah, entered appearances for intervenor Kern River Gas Transmission Co.
 
 
 4
 David J. Gilmore, Los Angeles, Cal., entered an appearance for intervenor Southern California Gas Co.
 
 
 5
 David L. Huard, Los Angeles, Cal., entered an appearance for intervenor Pacific Interstate Transmission Co.
 
 
 6
 Before: WALD, STEPHEN F. WILLIAMS and D.H. GINSBURG, Circuit Judges.
 
 
 7
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 8
 Altamont Gas Transmission Company objects to the Federal Energy Regulatory Commission's dismissal of its application for authority to construct a pipeline--a dismissal that enabled a rival company to secure authority for an arguably competing project without a comparative hearing. See Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). Altamont contends that FERC's justification for early dismissal of its application--that its incompleteness would hinder an ultimate determination of the project's economic viability--was arbitrary and capricious. Finding no such error, we dismiss the petition for review.
 
 
 9
 * * * * * *
 
 
 10
 Anticipating a growing demand for natural gas in California, gas carriers in the region have sought to lay new pipelines and to increase the capacity of old ones. On December 20, 1988 Altamont's rival, Pacific Gas Transmission Company ("PGT"), applied to FERC for authorization under § 7(c) of the Natural Gas Act to expand existing facilities. See 15 U.S.C. § 717f(c) (1988). The project would permit PGT to increase the amount of Canadian gas that it could ship to Malin, Oregon, near the California border, where its parent, Pacific Gas & Electric Company ("PG & E") would receive the gas for transmission to markets in California. PG & E needed to expand its facilities in order to carry the additional load, but since it operated only in California, it applied to the California Public Utilities Commission for the necessary authority rather than to FERC.
 
 
 11
 On July 21, 1989 Altamont filed its § 7 application for authority to build a pipeline to carry gas from the Canadian border to Wyoming, to be transported from there to the south-central Californian market by Kern River Transmission Company. While Kern River had a pending application for FERC authority for a Wyoming-California pipeline, the facilities contemplated would not have been able to handle all of the additional load from Altamont.[1] Kern River promised Altamont it would expand the planned facilities.
 
 
 12
 Kern River did not, however, file an application for additional authority. Altamont, after an exchange of letters in which FERC inquired about the unfiled application, wrote on March 14, 1990 stating that Kern River had promised Altamont that it would do so 55 days after the later of (a) receipt of a certificate to construct its original facilities "no longer subject to rehearing" and (b) execution of contracts with certain shippers.
 
 
 13
 On May 1, 1990 FERC ruled that Altamont's and PGT's applications were both incomplete, and gave them until May 15, 1990 to fill the gaps. In Altamont's case, it said, this would require (among other things) Kern River's application for authority [296 U.S.App.D.C. 138] to build the larger Wyoming-to-California facilities. Pacific Gas Transmission Co., 51 FERC p 61,112 (1990). Both Altamont and PGT filed amended applications on that date, but the requested Kern River filing did not appear.
 
 
 14
 On June 28, 1990 FERC issued two orders that effectively buried the Altamont application. The first denied Altamont's petition for rehearing of the May 1 order. Altamont Gas Transmission Co., 51 FERC p 61,364 (1990) ("Incompleteness Order on Rehearing"). The second found that Altamont had disobeyed the May 1 order by failing to get Kern River to submit its application, and dismissed Altamont's application. Altamont Gas Transmission Co., 51 FERC p 61,365 (1990) ("Dismissal Order"). On December 18, 1990 FERC denied Altamont's request for a rehearing. Altamont Gas Transmission Co., 53 FERC p 61,395 (1990) ("Dismissal on Rehearing"). FERC did not dismiss PGT's application, and, indeed, approved it on August 1, 1991. Pacific Gas Transmission Co., 56 FERC p 61,192 (1991). Petitions for review of that decision are now pending in this court. Altamont Gas Transmission Co. v. FERC, No. 91-1369 (D.C.Cir. filed Aug. 6, 1991), and consolidated cases.
 
 
 15
 In the meantime, Altamont applied for "optional expedited certification" of essentially the same facilities, which the Commission granted. Altamont Gas Transmission Co., 54 FERC p 61,028 (1991); Altamont Gas Transmission Co., 56 FERC p 61,199 (1991). Though easier to secure, such authority leaves the pipeline with more financial risk than does a conventional § 7 certificate. See 18 CFR § 157.103(d) (1991); Associated Gas Distributors v. FERC, 824 F.2d 981, 1030-38 (D.C.Cir.1987). Thus Altamont continues aggrieved by FERC's dismissal of its § 7(c) application.
 
 
 16
 * * * * * *
 
 
 17
 Altamont claims that where dismissal of an application forecloses a comparative hearing required by the Ashbacker doctrine, we must subject the dismissal to "heightened scrutiny", either as a supplement to the ordinary "arbitrary and capricious" test or as a variation of that test. Neither of those formulations quite states the court-agency relation correctly. Foreclosure of an Ashbacker hearing is obviously an important consequence, both for a barred applicant and potentially for the public--through loss of the service of a possibly better licensee. Obviously the Commission must weigh these effects in designing and enforcing rules to weed out applications that are doomed or that, because of substantial omissions, would be most unlikely to prevail without protracted delay. Accordingly, we have "scrutinized closely" agency actions foreclosing a comparative hearing, New South Media Corp. v. FCC, 685 F.2d 708, 715 (D.C.Cir.1982), i.e., we have insisted on reasons that the agency could find adequate to justify defeat of the values its decision has foreclosed. But we have not purported to alter the standard of review prescribed by 5 U.S.C. § 706(2)(A).
 
 
 18
 Where "two bona fide applications are mutually exclusive", the Ashbacker case forbids the agency to grant a license to one without first holding a hearing on both. 326 U.S. at 333, 66 S.Ct. at 151. The express limitation to bona fide applications implies an agency power to impose a variety of reasonable threshold requirements, not confined to literal want of bona fides. To read Ashbacker otherwise would improperly curtail the agencies' broad freedom to select their procedures. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Counsel, Inc., 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).
 
 
 19
 FERC here rejected Altamont's application on the ground that it did not show the availability of downstream facilities adequate to carry the new load. Dismissal on Rehearing, 53 FERC at 62,373. As the Commission assesses a project's viability in the light of conditions all the way from supplier to user, see Kansas Pipe Line & Gas Co., 2 FPC 29, 40-55 (1939), it requires the applicant to provide information on all the links of the chain on which it depends, including interdependent applications. See 18 CFR §§ 157.6, 157.13(c). Since Kern [296 U.S.App.D.C. 139] River did not file an application for authority to expand its facilities, FERC had neither the information necessary to verify Altamont's claims about the proposed downstream facilities, nor the assurance of the facilities' provider that it was committed to bringing them into existence. In the past the Commission has dismissed an application as incomplete for want of endorsement by the applicant's intended downstream carrier, see Transcontinental Gas Pipe Line Corp., 51 FERC p 61,173 (1990); East Tennessee Natural Gas Co., 51 FERC p 61,247 at 61,691 (1990), as well as for simple lack of information on downstream transportation capacity, see Southern Natural Gas Co., 35 FERC p 61,126 (1986); Texas Eastern Transmission Corp., 34 FERC p 61,120 (1986).
 
 
 20
 Altamont argues that FERC should have been satisfied with Altamont's assurances that Kern River had entered a contract to provide downstream transportation for Altamont and that Kern River promised Altamont to file its application shortly after certain events had taken place. However, because the commitment was contingent--indeed, in part contingent on events within Kern River's control (the execution of contracts between Kern River and certain potential shippers)--FERC could reasonably find Altamont's assurances and Kern River's promises unsatisfactory.
 
 
 21
 Even if FERC could set minimum standards below which its application fell, Altamont argues that its application was just as complete as others, such as PGT's, that FERC has not dismissed. PGT's, in fact, lacked any application by Northwest Pipeline Corporation to FERC, even though transportation by Northwest was necessary for 7% of the supply that PGT proposed to handle. We think the Commission was not at all arbitrary, however, in drawing a distinction between PGT's 7% gap and Altamont's far larger one (roughly a 70% gap, if we accept Altamont's rather belated claim that the facilities contemplated by Kern River's pending application could handle 200 of the expected 700 MMcf load, see note 1 above). Altamont points out that a 7% reduction of PGT's service might have rendered the project economically nonviable, and argues accordingly that FERC should have made findings as to the likelihood of this possibility. But the Commission necessarily takes some risks and was hardly unreasonable in deciding (without additional inquiry, which itself might have proved complex and time-consuming), that a 7% shortfall, discounted by the likelihood of Northwest's coming through, did not warrant dismissal, whereas a 70% shortfall, discounted by the likelihood of Kern River's coming through, did. See Dismissal on Rehearing, 53 FERC at 62,374 & n. 13.[2]
 
 
 22
 Altamont also spots discrimination in FERC's failure to require applicants to show that all necessary third-party filings have been made, including those with other agencies, such as the California Public Utilities Commission in PGT's case, and the necessary Canadian authorities in the case of both Altamont's and PGT's upstream suppliers.[3] We need not address this claim, as Altamont did not raise it in its petition for rehearing. See 15 U.S.C. 717r(b).
 
 
 23
 Altamont finally argues that FERC's conduct here was inconsistent with its treatment of applications in later cases. Normally, we disregard such claims. If a decision is consistent with earlier ones, the [296 U.S.App.D.C. 140] agency cannot be said to have made an unjustified "swerve"; a later change, even if itself invalid for want of explanation or some other reason, cannot retroactively invalidate a decision that was sound when made. See Showtime Networks, Inc. v. FCC, 932 F.2d 1, 6 n. 8 (D.C.Cir.1991); Amor Family Broadcasting Group v. FCC, 918 F.2d 960, 962 (D.C.Cir.1990); Cellular Mobile Systems of Pennsylvania, Inc. v. FCC, 782 F.2d 182, 207-08 (D.C.Cir.1985). As the Commission does not raise that point, however, but defends the decisions as entirely consistent, we proceed to examine the alleged inconsistency.
 
 
 24
 Here Altamont relies on FERC decisions relating in one case to El Paso Natural Gas and in the other to Northwest Pipeline's application for the very facilities needed for PGT's last 7%. As to El Paso, Altamont points out that the Commission gave a tentative approval to its project, without evidence of essential upstream and downstream facilities, solving the problem simply by conditioning final approval on submission of the requisite evidence. El Paso Natural Gas Co., 55 FERC p 61,180 (1991). If El Paso deserved conditional approval without the evidence being in hand, why, Altamont says, did Altamont not deserve at least to be admitted to the competition with PGT? The answer lies in the peculiar procedural posture of the case. El Paso had applied for an optional expedited certificate, which because of the pipeline's greater assumption of risk does not require a showing of related facilities. FERC on its own converted the application into one for a § 7(c) certificate, which it approved conditionally, and then asked for additional information. El Paso responded immediately with assurances that adequate capacity existed, and FERC issued the certificate of approval. El Paso Natural Gas Co., 56 FERC p 61,198 (1991). Although the Commission issued the initial contingent approval without any information about related facilities, it did so only because it had, on its own hook, shoved El Paso into a position where evidence as to related facilities was needed.[4]
 
 
 25
 In Northwest Pipeline Corp., 56 FERC p 61,300 (1991), the Commission actually issued a certificate without detailed evidence of the related facilities, but only on Northwest's assurance that they already existed.[5] Indeed, in its second El Paso order, the Commission similarly relied on mere assurances. See El Paso Natural Gas Co., 56 FERC at 61,769. But the answer here lies in the difference between needed facilities that exist (as in El Paso and Northwest), and needed facilities that will have to be brought into existence (as here, and as in two other 1991 decisions, Natural Gas Pipeline Co. of America, 55 FERC p 61,424 (1991); Northern Border Pipeline Co., 55 FERC p 61,423 (1991)). As the Commission explained in Northwest, it seeks to assess the cumulative environmental impact of a project, including all related new facilities, for purposes of compliance with the National Environmental Policy Act of 1969. It needs detailed information for that purpose about new facilities, information that is unneeded when the related facilities are pre-existing and thus involve no such environmental issue. Accordingly, where the applicant credibly assures it as to existing facilities, it is ready to rest on those assurances. Northwest, 56 FERC at 62,267-68.
 
 
 26
 In an alternative claim from the later cases, Altamont argues that FERC should at least have accepted its application and been prepared to solve the problem of related facilities by assigning to Altamont the risks of any shortfall in volume arising from their not being built, citing Northwest Pipeline Corp., 56 FERC at 62,268, and Transwestern Pipeline Co., 54 FERC p 61,031 at 61,090, 61,092-93 (1991). But the [296 U.S.App.D.C. 141] Commission appears to have designed these at-risk provisions to handle less drastic defects--in Northwest, uncertainty about shippers' ability to secure rights to existing capacity; in Transwestern, the scanty character of Transwestern's evidence of market "need".
 
 
 27
 Finally, Altamont accuses FERC of dismissing its application on the ground that Altamont filed a separate application for an optional expedited certificate, citing the Dismissal Order, 51 FERC at 62,181. But FERC merely noted there that Altamont had made such a filing; it nowhere based its decision on that filing. Of course the existence of the OEC program may alter the values at stake in § 7(c) proceedings in a way that affects the Ashbacker problem; but as the Commission has not relied on it we do not consider the point.
 
 
 28
 We therefore deny the petition for review.
 
 
 29
 So Ordered.
 
 
 
 [1]
 Altamont says that Kern River's contemplated facilities could handle 200 of the 700 MMcf additional daily load, leaving 500 MMcf unaccounted for. Reply Brief at 15. Since FERC is vague on this issue, we assume that Altamont is correct
 
 
 [2]
 Although in its reply brief Altamont obliquely suggests that while a 100% gap may justify dismissal, a 70% gap does not, see Reply Brief at 15 & n. 20, it did not make this argument below, cf. Request for Rehearing of Altamont Gas Transmission Company at 7, and thus we do not have jurisdiction to consider it. 15 U.S.C. § 717r(b)
 
 
 [3]
 In distinguishing the legal significance of Kern River's and PG & E's respective failures to apply for authority, the Commission said that it had no jurisdiction over PG & E. Dismissal on Rehearing, 53 FERC at 62,375. Intervenor El Paso argues that this conclusion was erroneous, but we leave that issue to the panel that hears the petition for review of PGT's application. As we do not address Altamont's claims with respect to PGT's failure to show filings for its proposed downstream leg, the issue of jurisdiction over that leg is irrelevant; in any event, Altamont has not quarrelled with FERC's conclusion on the jurisdictional point. Cf. Altamont's Brief at 18
 
 
 [4]
 FERC converted El Paso's optional expedited certificate application into one for a § 7 certificate for various reasons that do not appear relevant to the present case. See El Paso Natural Gas Co., 56 FERC at 61,765. Altamont does not suggest that FERC should have performed a similar conversion of its application for an optional certificate
 
 
 [5]
 The Commission had previously ordered Northwest to reduce the size of the planned facilities to the extent that related capacity was unaccounted for. Northwest Pipeline Corp., 56 FERC p 61,006 (1991). The order discussed in the text rescinded that reduction